IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ARUNAN SIVALINGAM, M.D. :  CIVIL ACTION
         :
   v.      :
         :
UNUM LIFE INSURANCE COMPANY OF :
AMERICA        :  NO. 09-4702

MEMORANDUM

Bartle, C.J.           April 26, 2011

Plaintiff Arunan Sivalingam, M.D. ("Sivalingam") filed
suit against Unum Life Insurance Company of America ("Unum")
under the Employee Retirement Income Security Act ("ERISA"), 29
U.S.C. § 1132(a)(1)(B). Sivalingam contends that Unum improperly
terminated payment of long term disability benefits under an
insurance policy issued to Sivalingam's employer. He seeks
declaratory and monetary relief. Unum counterclaimed against
Sivalingam to recover alleged overpayments of benefits it paid
him under the policy.

Before the court are the parties' cross-motions for
summary judgment and Unum's motion to strike Sivalingam's reply
brief in support of his motion for summary judgment.

I.

Summary judgment is appropriate when "the pleadings,
the discovery and disclosure materials on file, and any
affidavits show that there is no genuine issue as to any material
fact and that the moving party is entitled to judgment as a
matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v.

Catrett, 477 U.S. 317, 323 (1986).  A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986).  Accordingly, the court makes all reasonable inferences from the evidence in the light most favorable to the non-movant.  In re Flat Glass Antitrust Litig., 385 F.3d 350, 357 (3d Cir. 2004).

## II.

The following facts are undisputed.  Sivalingam is a retinal surgeon who practiced medicine with Ophthalmic Subspecialty Consultants, P.C. ("OPC"), now known as Ophthalmic Partners of Pennsylvania ("OPP").  In November 1997, Sivalingam suffered a severe heart attack, and in June 1998, he received a heart transplant.  As a result of the transplant, Sivalingam must take daily immunosuppressive drugs that cause him to experience tremors and cramps in his hands.  These tremors and cramps interfere to some extent with his ability to perform retinal surgeries.

At the time of Sivalingam's cardiac event, OPC maintained a long-term disability insurance policy with Unum. Sivalingam filed a claim for benefits under this policy, and Unum, acting in its role as plan administrator, determined him to be eligible to receive benefits.  Unum began paying Sivalingam a monthly benefit of $22,075.32 on February 11, 1998.

Days after his heart transplant in June 1998, Sivalingam and eleven other physicians formed Main Line Surgery

-2-

Center, LLC ("MLSC"), an entity in which Sivalingam owns a 9.09%
interest.  Shortly thereafter, in September 1998, Sivalingam sold
his ownership interest in OPC, now known as OPP, but resumed
part-time employment with it.  At that time, Sivalingam executed
an employment agreement with OPP under which he would receive a
salary of $240,000 and reimbursement of "direct expenses" up to
$60,000.  Through a series of amendments between 1998 and 2005,
OPP reduced Sivalingam's salary to $120,000 and increased his
limit for reimbursement of direct expenses to $120,000.[1]  From
1998 up until the present, Sivalingam has been a part owner of
MLSC and an employee of OPP.  He has regularly received income
from both entities.

In February 2008, Unum received a call from an
anonymous source who reported that Sivalingam and OPP were not
being "completely forthright" in reporting Sivalingam's
compensation from his employment at OPP.  Unum began
investigating Sivalingam's income from employment to determine
whether he continued to qualify for benefits under the terms of
the UNUM disability policy.  In May 2008, Unum stopped disbursing
payments to Sivalingam because it determined he no longer
qualified for benefits under the policy based on the size of his
earnings.

---

1.  Sivalingam's employment agreements with OPP define direct
expenses as including "employment taxes, 401K employee
contributions, subscriptions, physician benefits, dues and
licenses, automobile expenses related to work, work related
entertainment, health insurance premiums and medical staff dues."

Over the next year, Sivalingam took two appeals to Unum's internal appeals department and submitted numerous documents for Unum to review. Sivalingam also provided the opinion of a certified public accountant, who criticized Unum's analysis based on his experience in practice before the IRS and his knowledge of other physicians' compensation structures. Unum reached a final decision in June 2009 that Sivalingam's earnings disqualified him from receiving disability benefits as of January 11, 2004. In the process, Unum concluded that between 1998 and 2008, Sivalingam had received $1,430,128.42 in disability benefits for which he had not been eligible.

Sivalingam filed suit challenging the termination of his benefits. In Counts I and III of his complaint, Sivalingam asks the court to declare that Unum acted arbitrarily and capriciously in terminating his long term disability benefits and requests that the court enjoin Unum from continuing to violate the terms of the policy. Count II contained a claim for all past, present, and future benefits due Sivalingam under the policy.

Unum counterclaimed for the imposition of a constructive trust or an equitable lien on any "identifiable funds containing overpaid [disability benefits]" in the amount of $1,430,128.42. Sivalingam belatedly answered Unum's counterclaim after the parties' cross-motions for summary judgment were fully briefed.

III.

   A person is "disabled" within the meaning of the Unum
policy if "because of injury or sickness" he or she is unable to
"perform each of the material duties of his regular occupation."
A person is also disabled within the policy's definition if
"because of sickness or injury" he or she is "unable to perform
all of the material duties of his [or her] regular occupation on
a full-time basis" but "is performing at least one of the
material duties of his [or her] regular occupation or another
occupation on a part-time or full-time basis; and [earns]
currently at least 20% less per month than his indexed pre-
disability earnings due to that same injury or sickness."  It is
undisputed the tremors and cramps Sivalingam experiences due to
his pharmaceutical regimen after his heart attack allow him to
work only part time as a surgeon.

   The disability policy defines a disabled employee's
"basic monthly earnings" as the "monthly rate of earnings from
the employer in effect just prior to the date disability begins"
and "bonuses, but not commissions, overtime pay or other extra
compensation."  The policy refers to "basic monthly earnings"
adjusted for inflation as "indexed pre-disability earnings."

   Unum will pay monthly disability benefits up to 70% of
an employee's basic monthly earnings with a maximum monthly
benefit of $25,000.[2]  Benefits are terminated if the disabled

---

2.  If the disabled employee is working more than 12 months after
                       (continued...)

employee's "current earnings exceed 80% of his indexed pre-disability earnings."  Unum terminated Sivalingam's long term disability benefits in May 2008 after its investigation revealed his "current earnings" had surpassed this threshold amount in 2004.

## IV.

The parties agree that OPP's long term disability policy with Unum is an employee-benefit plan subject to the terms of ERISA.  In a memorandum and order dated July 1, 2010, the court explained that Unum's decision to terminate Sivalingam's disability benefits is reviewed under the deferential "abuse of discretion" standard.[3]  See Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 113 (1989) (quoting 29 U.S.C. § 1133(2)).  Under this standard of review, an administrator's decision will be overturned only if it is "without reason, unsupported by

---

2.(...continued)
becoming disabled, and he earns more than 20% of his "basic monthly earnings," then the employee receives benefits in accordance with a formula.  The formula is "(A divided by B) [multiplied by] C" where "A = The insured's 'indexed pre-disability earnings' minus the insured's monthly earnings received while he is disabled.  B = The insured's 'indexed pre-disability earnings'.  C = The benefit as figured above, but not including adjustments under the Cost of Living provision." "Indexed pre-disability earnings" are defined as "basic monthly earnings" adjusted for inflation in accordance with the Consumer Price Index.

3.  Courts sometimes refer to this as an "arbitrary and capricious" standard of review, which is synonymous with "abuse of discretion."  Estate of Schwing v. Lilly Health Plan, 562 F.3d 522, 526 n.2 (3d Cir. 2009); Abnathya v. Hoffmann-La Roche, Inc., 2 F.3d 40, 45 n.4 (3d Cir. 1993).

substantial evidence or erroneous as a matter of law." Miller v. Am. Airlines, Inc., 632 F.3d 837, 845 (3d Cir. 2011) (internal quotations omitted) (quoting Abnathya v. Hoffmann-La Roche, Inc., 2 F.3d 40, 45 (3d Cir. 1993)). "The court is not free to substitute its own judgment for that of the [administrator] in determining eligibility for plan benefits." Abnathya, 2 F.3d at 45.

In conducting our review, we limit ourselves to the administrative record, that is, to the "evidence that was before the administrator when [it] made the decision being reviewed." Mitchell v. Eastman Kodak Co., 113 F.3d 433, 440 (3d Cir. 1997); see also Post v. Hartford Ins. Co., 501 F.3d 154, 168 (3d Cir. 2007). We also evaluate the inherent conflict of interest that arises when a plan administrator "both determines whether an employee is eligible for benefits and pays benefits out of its own pocket." Met Life Ins. Co. v. Glenn, 554 U.S. 105, 108 (2008). Yet, "[u]ltimately, we determine lawfulness by taking account of several different, often case-specific, factors, reaching a result by weighing all together." Miller, 632 F.3d at 845 (internal quotations omitted) (quoting Glenn, 554 U.S. at 117).

In this case we permitted Sivalingam the opportunity to take narrowly-circumscribed discovery to explore the extent of Unum's conflict of interest and any steps Unum may have taken to reduce bias. As we explained, "Discovery is the only way the record can be fully developed on the conflicts issue. Otherwise,

we would be handicapped in analyzing all the factors we must consider in deciding whether an abuse of discretion has occurred." Sivalingam v. Unum Life Ins. Co. of Am., No. 09-4702 slip op. at 12 (E.D. Pa. July 1, 2010). Thus, we review here not only Unum's administrative record but also the materials produced in discovery.

V.

Sivalingam maintains that Unum's decision to terminate his benefits was tainted by a structural conflict of interest. As noted above, a plan administrator, such as Unum, which both determines whether an employee is entitled to benefits and also pays those benefits has an inherent conflict of interest. Glenn, 554 U.S. at 112-15. The weight to be given this conflict depends upon both the administrator's history in paying or denying claims and any steps it has taken "to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits." Id.

Sivalingam contends that Unum has an established track-record of unjustifiably denying benefits under plans it administers. He observes that the Supreme Court in Glenn, in requiring lower courts to consider an administrator's payment history, cited a law review article describing Unum's pattern of biased decision-making. Glenn, 554 U.S. at 117 (citing John H.

Langbein, Trust Law as Regulatory Law, 101 Nw. U. L. Rev. 1315, 1317-21 (2007)). Unum entered into a regulatory settlement agreement with state and federal law enforcement agencies in November 2004 under which Unum agreed to reassess claim denials made between 2000 and 2004. See Melczer v. Unum Ins. Co. of Am., Case No. 07-2560, 2009 U.S. Dist. LEXIS 24642, at *2-*4 (D. Ariz. Mar. 24, 2009); Langbein, Trust Law, supra, at 1317-21. However, the practices that prompted the regulatory settlement agreement and the Langbein article ended by 2004, a number of years before Unum's 2008-2009 investigation and resolution of Sivalingam's claim. See Melczer, 2009 U.S. Dist. LEXIS at *2-*4; see also Fortlage v. Heller Ehrman LLP, Case No. 08-3406, 2009 WL 6391364, at *22 (N.D. Cal. Dec. 18, 2009) rev'd on other grounds 2010 WL 1729462, at *3 (N.D. Cal. Apr. 27, 2010); Cagle v. Unum Life Ins. Co. of Am., Case No. 07-157, 2009 WL 995544, at *16 (E.D. Mo. Apr. 13, 2009). Of course, nothing in the Langbein article addresses Unum's conduct in reviewing Sivalingam's claim.

Sivalingam also contends that the discovery taken in this case reveals that Unum's claims review process is inherently biased. Sivalingam points to the testimony of Veronica Hargrave, Unum's Rule 30(b)(6) deposition designee, who testified that Unum does not maintain a "code of conduct" for its employees, does not offer training on Unum's fiduciary duty to claimants, and does not "wall off" the employees making decisions on claims from the employees managing the company's finances.

These arguments lack merit.  Hargrave did testify for Unum that she was not aware of a "code of conduct" and that she is not aware of specific training Unum offers on its "fiduciary duties" to those claiming benefits.  Yet the substance of her testimony shows that Unum provides its employees with training on ethics, including the need to make "full, fair, and objective decisions."  Hargrave testified, "I believe that our obligation is to make the right decision, based on the terms of the policy, and the information contained in the claim file."  She answered, "Correct," when asked if Unum's "obligation is to make the right determination" on claims for benefits.  Against this testimony, Unum's failure to maintain a document specifically entitled a "code of conduct" or to provide training on the meaning of the words "fiduciary duty" is of little moment.

Similarly misplaced is Sivalingam's reliance on deposition testimony in which Hargrave said Unum does not "wall off" its claims administrators from its employees with financial responsibilities.  Hargrave explained in a declaration that she gave the testimony at issue because she misunderstood a question from Sivalingam's attorney.  Her declaration explains that, following a break and while off the record, Unum's attorney alerted Sivalingam's attorney to the misunderstanding and requested the opportunity for Hargrave to correct her answer on the record.  Sivalingam's attorney refused the request, and Unum's attorney stated Hargrave would clarify her position in a declaration.  The Hargrave declaration submitted to the court

explains that Unum employees involved in the company's finances do not make decisions on or attempt to influence decisions on claims for benefits. Sivalingam had the Hargrave declaration available when he filed his motion for summary judgment but did not address its contents.[4]

Whatever Unum's past practices may have been, the record shows that by the time it considered Sivalingam's claim in 2008 and 2009, Unum had taken steps to blunt the effect of any inherent conflict of interest by separating its financial managers and claims administrators. Because Unum could not completely eliminate the inherent conflict of interest, we are required by precedent to give this factor some weight, albeit slight. See Miller, 632 F.3d at 847-48.

Sivalingam next argues that the procedure Unum used to review his claim was marred by procedural irregularities. Our Court of Appeals has found that certain procedural irregularities can support a finding that an administrator's decision was

---

4. In his reply brief supporting his motion for summary judgment, Sivalingam suggests we disregard the Hargrave declaration, presumably as a sham, because Unum's counsel had the opportunity to but did not correct Hargrave's misunderstanding on the record. See Jiminez v. All Am. Rathskeller, Inc., 503 F.3d 247, 253-54 (3d Cir. 2007). Unum's failure to correct its representative's mistaken testimony on the record is puzzling. Nonetheless, Sivalingam knew during the deposition that Hargrave gave an incorrect answer and was willing to correct that answer on the record. Sivalingam also knew that Unum intended to correct Ms. Hargrave's testimony with a declaration. Because Sivalingam's counsel chose not to hear what Hargrave had to say, he cannot now complain that statements in the Hargrave declaration are either inconsistent with prior testimony or prejudice plaintiff's case.

arbitrary and capricious, that is, an abuse of discretion. <u>See</u> <u>Post v. Hartford Ins. Co.</u>, 501 F.3d 154, 164-65 (3d Cir. 2007).[5] Such irregularities include "(1) reversal of position without additional medical evidence ... (2) self-serving selectivity in the use and interpretation of physicians' reports ... (3) disregarding staff recommendations that benefits be awarded ... and (4) requesting a medical examination when all of the evidence indicates disability." <u>Id.</u> at 165 (internal citations omitted).

Sivalingam maintains that Unum improperly terminated an appeal he had taken to Unum's internal appeals department so that Unum's claims examiner could build a better case for denial of disability benefits. On May 9, 2008, Unum wrote a letter to Sivalingam communicating its determination that he had become ineligible for benefits under the policy and had received an overpayment of benefits. Unum's letter informed Sivalingam that his benefits would be suspended while Unum awaited other documentation it had previously requested from him but had not received. The letter further informed him that he had a right to take an appeal to Unum's internal appeals department within 90 days.

5. In <u>Post</u>, our Court of Appeals found that procedural irregularities may justify heightened scrutiny under the then-ascendent "sliding scale" approach to abuse of discretion review. <u>See</u> 501 F.3d at 164-65. Subsequently, in <u>Estate of Schwing v. The Lilly Health Plan</u>, the Court of Appeals held that the Supreme Court's opinion in <u>Glenn</u> was inconsistent with the sliding scale method. 562 F.3d 522, 525-26 (3d Cir. 2009). In conducting a post-<u>Glenn</u> abuse of discretion review, the court may give weight to those factors that previously triggered heightened scrutiny under the sliding scale test. <u>See</u> <u>Miller</u>, 632 F.3d at 845 n.3.

On August 6, 2008, Sivalingam's attorney sent a letter to Unum enclosing additional requested documents and asking Unum to treat the letter as an appeal of its May 9, 2008 termination decision.  Two days later, on August 8, 2008, Unum's internal appeals department informed Sivalingam by letter that the information in the file did not support reinstating benefits. The appeals department stated it was returning the case to a claims examiner to review the new information Sivalingam provided in his August 6, 2008 letter and to obtain additional documents from Sivalingam.

By October 2008, Sivalingam had retained new counsel. On November 17, 2008, a Unum representative spoke with Sivalingam's new attorney by phone.  The parties disagreed about whether Unum should have allowed an appeal from the May 9, 2008 decision to terminate Sivalingam's benefits.  To resolve the disagreement, Unum proposed that once the claims examiner finished reconsidering her position and issued a final decision, Sivalingam would have a fresh 90-day period to take an appeal. Sivalingam's attorney agreed to this proposal and further agreed to withdraw the August 6, 2008 appeal.  The withdrawal of the appeal occurred on December 22, 2008.

This sequence of events is undisputed and unremarkable. Sivalingam has not explained why the decision of Unum's appeals department to remand the case to the claims examiner to consider newly-provided information in the first instance is suspicious or

irregular.[6]  Indeed, if anything, it shows Unum's willingness to afford Sivalingam a full opportunity to make his case.  Any purported procedural irregularities do not give rise to an inference that Unum abused its discretion.

VI.

Sivalingam next asserts that Unum abused its discretion in computing his "current earnings" under the policy.  As noted above, Sivalingam's disability benefits terminated when his current earnings exceeded 80% of his "indexed pre-disability earnings."

Unum determined that Sivalingam's current earnings surpassed this threshold on January 11, 2004.[7]  Unum calculated Sivalingam's monthly earnings as of the eleventh day of the month, presumably because his benefits were paid for the first time on that day of the month.  For 2004, Unum calculated his current earnings as including the following:  (1) $214,058 he

_____

6.  Sivalingam suggests in a footnote that this procedure violated Unum's policy for processing appeals.  Unum's Rule 30(b)(6) designee testified that, generally, once a case is moved from the claims examiner to the appeals department, the claims examiner has no further role in the appeal.  Hargrave was not asked whether Unum's procedures allow the appeals department to return the claim to an examiner in cases such as this where new documents accompany the appeal request.

7.  Our discussion focuses on the conclusions Unum reached regarding Sivalingam's current earnings for 2004.  Unum's investigation encompassed earlier and later years, however, and in some cases, Unum's inclusion of certain money as current earnings for 2004 relied on information about Sivalingam's relationship with OPP and MLSC in other years.

-14-

received from OPP in wages and expense reimbursements[8]; (2) $99,159 he received from MLSC; and (3) $134,180 representing a bonus that OPP never paid him.  Unum averaged the sum of these amounts over 12 months to determine Sivalingam's earnings per month.[9]

Sivalingam's indexed pre-disability earnings for the month beginning January 11, 2004 were $35,189.91.[10]  Thus, if Sivalingam had current earnings exceeding 80% of this amount, that is $28,151.93, he no longer qualified for benefits under the policy.  According to Unum's calculations, Sivalingam received the following average amount in each month of 2004:

| | |
|---|---|
| OPP salary & expense reimbursements: | $17,838.17 |
| OPP bonus: | 11,182.50 |
| MLSC income: | 8,263.25 |
| Total: | $37,283.92[11] |

---

8.  As explained below, Unum reduced Sivalingam's total 2004 receipts from OPP by $30,000 to account for expense reimbursements it considered reasonable.

9.  The policy does not specify how current earnings are to be calculated.  Sivalingam does not argue that Unum abused its discretion by averaging all of his sources of 2004 income over 12 months to compute current earnings.

10.  Sivalingam's indexed pre-disability earnings for every other month of 2004 were calculated as $35,964.09 due to an inflation adjustment Unum applied as of February 11, 2004.

11.  Although Sivalingam's expert accountant disagreed with Unum's assumption that these funds were current earnings, he agreed that Unum performed the arithmetic correctly.

The $37,283.92 figure exceeds 80% and, in fact exceeds 100% of his indexed pre-disability earnings so that he became ineligible for benefits under the policy formula.

While the policy does not define the term current earnings, it bestows on Unum the discretion to "construe the terms of this policy." Consequently, Unum's determination of what constitutes current earnings is entitled to deference as long as Unum did not abuse its discretion. <u>Firestone</u>, 489 U.S. at 115; <u>see</u> <u>Howley v. Mellon Fin. Corp.</u>, 625 F.3d 788, 795 (3d Cir. 2010).[12]

Unum first determined that both salary from OPP and portions of expense reimbursements OPP paid Sivalingam were current earnings. There is no dispute that Sivalingam's salary from OPP are current earnings. Unum's investigation uncovered that Sivalingam was entitled to a salary from OPP of $120,000 and direct expense reimbursements of up to $120,000. Between 2000 and 2007, Sivalingam's actual annual expense reimbursements ranged from $74,320.16 to $159,367 and collectively totaled approximately $1 million. Furthermore, between 1998 and 2005,

_____

12. In analyzing whether Unum's interpretation of current earnings was an abuse of discretion, we consider the factors articulated by our Court of Appeals: "(1) whether the interpretation is consistent with the goals of the Plan; (2) whether it renders any language in the Plan meaningless or internally inconsistent; (3) whether it conflicts with the substantive or procedural requirements of the ERISA statute; (4) whether the [relevant entities have] interpreted the provision at issue consistently; and (5) whether the interpretation is contrary to the clear language of the Plan." <u>Howley</u>, 625 F.3d at 795.

OPP, with Sivalingam's agreement, adjusted his compensation structure so that his salary decreased and the limit on his expense reimbursements increased.[13]

Unum's analysis showed that Sivalingam's expenses were significantly higher than those of other physicians in practice with Sivalingam and that many of the paid expenses were either personal or excessive. For example, while OPP reimbursed Sivalingam only 80% of his gasoline expenses, OPP reimbursed him for 100% of his other automobile expenses, including a lease payment of $3,815 per month, and 100% of his meal and entertainment expenses, which included foreign travel to multiple cities, ski lessons, spa charges, and expenses Sivalingam's wife incurred during travel. Further, OPP paid Sivalingam for 100% of his phone expenses, amounting to approximately $500 per month. Sivalingam also appears to have recouped from OPP certain expenses his children incurred while in residence at out-of-state high schools.

Of the various amounts Sivalingam received in repayment of expenses, Unum decided to credit only $30,000 annually as legitimate. It concluded the remainder should be counted as

---

13. Sivalingam states that the expenses for which he was reimbursed included Social Security, federal and state unemployment taxes, worker's compensation and medicare taxes; health, life, and disability insurance; medical licenses, "development," and dues; legal expenses; 401K contributions and "contributions/donations"; gifts; various kinds of supplies; automobile, automobile insurance, parking, and travel; telephones, "data communication," and courier services; and things described only as "expense reimbursement" and "other benefits."

current earnings. Unum reached its $30,000 figure by examining the expense reimbursements of other OPP doctors. In particular, OPP looked at the expenses of Dr. Federman, who, like Sivalingam, traveled by car to numerous offices for his job at OPP. In 2005, for example, Sivalingam's automobile expenses were eight times Dr. Federman's expenses. Unum's accountant compared the amount Sivalingam purportedly spent on gas in 2005 to the number of business miles he logged that year, and concluded that the resulting low number of miles per gallon was inexplicable "[u]nless Dr. Sivalingam is driving an M-1 tank." Sivalingam has not explained to Unum the reasons his numbers were so much higher than his colleagues. Full-time OPP physicians were allowed up to $40,000 in expense reimbursements. Recognizing that Sivalingam only worked for OPP on a part-time basis, Unum deemed $30,000 a reasonable amount for his expense reimbursements.

Unum had a valid reason and substantial evidence for its decision to treat a portion of Sivalingam's expense reimbursements as current earnings. While one might argue with the exact amount that Unum allowed for expenses, Unum did not abuse its discretion under the circumstances.

Unum also concluded that Sivalingam's income from MLSC constituted current earnings, despite Sivalingam's insistence that the money was nothing more than a distribution of earnings from MLSC, a company in which Sivalingam is an owner. The administrative record supports Unum's conclusion. When Sivalingam became an owner in MLSC, its operating agreement

required all of its owners to be OPP employees.  In the event
that an MLSC owner ceased to practice medicine at OPP, that
person was required to offer to sell his or her interest in MLSC
to OPP.  According to notes of a conversation that a Unum claim
examiner had with OPP and MLSC's accountant, the MLSC operating
agreement was amended in either 2002 or 2003 to allow non-OPP
employees to own an interest in MLSC.  During Unum's 2008-2009
investigation, 11 of MLSC's 13 owners were employed by OPP, and
the two non-employee owners collectively owned less than 5% of
MLSC.

Additionally, Unum obtained information that
Sivalingam, as an owner in MLSC, was required to perform one-
third of his surgeries at MLSC.  MLSC's Executive Director Debra
Sanders informed Unum of this requirement in an April 25, 2008
telephone interview.  Sivalingam criticizes Unum's reliance on
this statement because in a subsequent undated "affidavit"[14]
Sanders stated that this one-third requirement "was not enforced
and was not required pursuant to the partnership agreement."
Significantly, Sanders' affidavit does not say the requirement
did not exist.  Regardless, Unum confirmed the existence of this
one-third requirement with another MLSC surgeon.

Further, Unum obtained MLSC records showing Sivalingam
performed between 39 and 122 surgeries annually at MLSC from 2000
through 2007.  Sivalingam says repeatedly that this work "was

14.  Although entitled an "affidavit," the statement is not
notarized or made under penalty of perjury.

billed through OPP," but he had not said who paid him to perform surgeries at MLSC. If Sivalingam elected or was required to forego receiving compensation on a surgery-by-surgery basis,[15] and instead received all his MLSC compensation in the form of profit distributions, Unum could rationally conclude that the essential nature of this money was the same. It was provided to Sivalingam in compensation for performing surgeries at MLSC. See, e.g., Nu-Look Design, Inc. v. Comm'r, 356 F.3d 290, 293 (3d Cir. 2004).

Sivalingam incorrectly suggests that Unum abused its discretion by failing to consider whether his MLSC income was "passive income"[16] as that term is defined by the Internal Revenue Code. Sivalingam has not identified any case in which a court required an ERISA plan administrator to interpret policy language in accordance with federal tax laws nor has he identified any compelling reason for those definitions to govern here. On the contrary, several courts have held that definitions in the Internal Revenue Code do not control a plan

_____

15. In Sivalingam's correspondence with Unum and his briefs to this court, he makes passing references to compensation limitations imposed by the Stark Laws or the Anti-Kickback rules. See 42 U.S.C. §§ 1320a, 1395nn. These laws generally prohibit physicians from referring Medicare or Medicaid patients to receive treatment at facilities in which they have a financial interest and from offering or receiving payment in exchange for a patient referral. Sivalingam did not explain to Unum and has not explained to the court how these statutes or the regulations thereunder would operate to impose limits on his compensation from MLSC.

16. "Passive income" is not a term used in the policy.

administrator's interpretation of plan language.  Unum Life Ins.
Co. of Am. v. Epes, 715 F. Supp. 2d 837, 840, 842-43 (E.D. Ark.
2010); D&H Therapy Assoc., LLC v. Bos. Mut. Life Ins. Co., 650 F.
Supp. 2d 143, 155 (D.R.I. 2009), rev'd on other grounds, ___ F.3d
___, 2011 WL 1487071, at *11-*13 (1st Cir. Apr. 20, 2011).

        Sivalingam also argues unpersuasively that his MLSC
income is not within the policy's definition of "earnings."
Sivalingam is correct that the word "earnings" appears in the
phrase "basic monthly earnings," which is defined as "monthly
rate of earnings from the employer."  Sivalingam is incorrect,
however, that only money received from OPP can be included toward
the 80% termination threshold because OPP is the "employer" to
which the disability insurance policy was issued.  The source of
the income is a limitation imposed only on the definition of
basic monthly earnings, but not on the term current earnings.
Sivalingam has not explained why current earnings should also be
limited to money paid by OPP, and he has cited no authority for
this proposition.  The policy explicitly states that the amount
of the employee's monthly disability benefits will be reduced "if
the insured is earning more than 20% of his indexed pre-
disability earnings in his regular occupation or another
occupation."  This language would lose all meaning if
Sivalingam's defintion of "earnings" prevailed.  We agree with
other courts reviewing Unum's application of the same policy
language at issue here which have approved of Unum's inclusion of
income from other employers in calculating current earnings.  See

Epes, 715 F. Supp. 2d at 840, 842-43; Fier v. Unum Life Ins. Co. of Am., Case No. 06-1162, 2009 WL 3644187, at *4, *7-*9 (D. Nev. Nov. 3, 2009), aff'd 629 F.3d 1095 (9th Cir. 2011).

Sivalingam argues that Unum abused its discretion because in 2009 Unum changed the way in which it classified Sivalingam's MLSC income. Generally, a plan administrator reversing position and terminating benefits based on information long within its possession "is an irregularity that counsels towards finding an abuse of discretion." Miller, 632 F.3d at 848; see Post, 501 F.3d at 164-65.

Sivalingam's argument fails because Unum obtained significant new information justifying its decision to treat that money Sivalingam received from MLSC as current earnings. We acknowledge Unum had some knowledge of Sivalingam's involvement with MLSC as far back as 2002. In that year, Unum conducted surveillance of Sivalingam. The investigator followed Sivalingam to MLSC and "[c]onfirmed [Sivalingam] was inside the office performing surgery."[17] Only after beginning its 2008 investigation, however, did Unum learn that Sivalingam was required to be an OPP employee in order to retain an ownership

17. Sivalingam contends that Unum learned of his work with MLSC in 2000 when a Unum representative interviewed Sivalingam about his part-time employment. According to the representative's report, however, Sivalingam stated that he was a part owner of MLSC, which "is a private investment." Sivalingam contrasted MLSC with the Wills Eye Center, which he said "is part of his practice which provides teaching at the hospital by doing rounds with students." Sivalingam also did not mention working at MLSC when recounting his weekly work schedule.

interest in MLSC, that Sivalingam is required to perform one third of his surgeries at MLSC, and that Sivalingam performed surgeries at MLSC consistently. Furthermore, the administrative record reveals that Sivalingam's former attorney had frequently represented to Unum that Sivalingam was only an investor in MLSC and that he was not working for MLSC. Unum's change in the treatment of the MLSC income was not without reason or unsupported by substantial evidence. In sum, the record does not support an inference that Unum acted arbitrarily and capriciously in considering Sivalingam's MLSC income as current earnings.

The final element that Unum added to its calculation of Sivalingam's 2004 earnings was a bonus of $134,180. It is undisputed, however, that Sivalingam did not receive any bonus, and there is no evidence that this money was even offered to him. Moreover, under his employment agreement with OPP, Sivalingam was not entitled to or eligible for a bonus in 2004.

The $134,180 figure simply appears in a document entitled the "2004 Compensation Model," subtitled the "Physician Compensation Summary - Final."[18] The record does not identify who prepared the compensation report, but an opinion submitted by Sivalingam's expert accountant to Unum states (in a footnote) that Sivalingam, "has been told that the documents that UNUM relied upon were prepared inaccurately by OPP's outside accountant/management consultant." The compensation summary

18. A "pro-forma" 2004 compensation model computes a slightly lower value for Sivalingam's bonus.

shows the $134,180 figure in the row bearing Sivalingam's name in a column labeled "2004 Bonus." The column to the right labeled "Other Adjust" reduces the amount of Sivalingam's bonus by $134,180 thereby zeroing out the entry made in the "2004 Bonus" column. The "Other Adjust" column then adds amounts totaling $134,180 to the bonuses of three other doctors. The compensation summary shows only a blank space in Sivalingam's row in the column named "2004 Bonus Payable." In sum, the report on which Unum relied does not show any bonus as paid or payable to Sivalingam. The 2004 compensation summary appears in the administrative record near similar summaries for other years. None of these summaries shows a bonus calculated for or paid to Sivalingam.

Unum's investigation revealed only that other OPP employees who, like Sivalingam, generated over $600,000 in revenue in a year were entitled to receive and did receive bonuses, including another OPP surgeon receiving long term disability benefits. Unum also performed a calculation demonstrating that Sivalingam had a financial incentive to receive non-taxable disability benefits rather than taxable bonus income. Even so, the fact remains that Sivalingam did not receive and was not entitled to a bonus. In fact, Unum concedes that the money in issue was actually paid to others. Unum's decision to include as part of Sivalingam's current earnings a $134,180 bonus which he never received and to which he was not entitled was an abuse of discretion. Unum's decision is contrary

to the clear language of the policy. No reasonable definition of current earnings under the policy can encompass such a phantom sum. Howley, 625 F.3d at 795.

Accordingly, only the $17,838.17 per month of OPP salary and expense reimbursements and the $8,263.25 per month of MLSC income constituted his 2004 current earnings. This results in a current earnings of $26,101.42 per month, which is only 74.17% of Sivalingam's indexed pre-disability earnings of $35,189.91 for the month beginning January 11, 2004. Since Sivalingam's current earnings in 2004 did not exceed 80% of his indexed pre-disability earnings, Unum improperly terminated his long term disability benefits for exceeding the 80% threshold. Sivalingam's motion for summary judgment will be granted to the extent it asks the court to declare that Unum's termination of Sivalingam's benefits was an abuse of discretion.

VII.

Unum also moves for summary judgment on its counterclaim, which seeks to recover $1,430,128.42 of benefits that it allegedly overpaid to Sivalingam between 1999 and 2008. Under 29 U.S.C. § 1132(a)(3), a plan fiduciary may bring a civil action to obtain "other appropriate equitable relief" to remedy, among other things, violations of the terms of a plan. Unum alleges that paying Sivalingam disability benefits to which he was not entitled under the policy violated the terms of an ERISA

plan.[19]  Specifically, Unum asks the court to impose a
constructive trust or equitable lien on any "identifiable funds
containing overpaid [disability benefits]."

     The Supreme Court has limited the types of relief
available under § 1132(a)(3).  In actions brought under that
provision, a plan fiduciary may obtain only those forms of
restitution traditionally available in equity.  Great-West Life &
Annuity Ins. Co. v. Knudson, 534 U.S. 204, 210-14 (2002).  The
traditional restitution mechanisms, such as equitable liens and
constructive trusts, "restore to the plaintiff particular funds
or property in the defendant's possession."  Id. at 214.  The
Supreme Court has found that these remedies are available only
"where money or property identified as belonging in good
conscience to the plaintiff could clearly be traced to particular
funds or property in the defendant's possession."  Id. at 213
(internal citations omitted).  If property "or its proceeds have
[sic] been dissipated so that no product remains," however, the
plaintiff cannot obtain relief under § 1132(a)(3).  Id. at 213-14
(internal citations omitted).

     Unum propounded interrogatories to Sivalingam asking
him to identify each account into which deposits of disability
benefits were made and to identify all property or goods that he

---

19.  The policy at issue does not require Sivalingam to pay
restitution to Unum in the event that Unum overpays benefits.
The policy does require Sivalingam to repay Unum if Unum overpays
benefits because Sivalingam received disability benefits under
the Social Security Act.  Unum's counterclaim does not include
any overpayment caused by Sivalingam's receipt of such benefits.

purchased after February 1998 using those benefits.  Sivalingam
responded to these requests by identifying the two bank accounts
into which benefits were deposited, listing some of his monthly
and annual expenses, and describing certain real property he
purchased in Pennsylvania and Maryland.

These interrogatory responses do not establish that the
money in the identified bank accounts came exclusively from Unum.
The interrogatory responses also do not suggest that Sivalingam's
real estate purchases were financed using only disability benefit
payments.  Unum's administrative record conclusively establishes
that between 1998 and 2008 Sivalingam received income from
sources other than Unum.  Moreover, Unum's own calculations
demonstrate that between 1999 and 2004 Sivalingam received some
disability benefits to which he was legitimately entitled.  In
sum, Unum has not identified any funds or property that can
"clearly be traced" to the overpaid benefits.  Id. at 213; see
Epes, 715 F. Supp. 2d at 846-47; Reichert v. Liberty Life
Assurance Co. of Bos., Case No. 05-2518, 2007 WL 433321, at *11-
*12 (D.N.J. Feb. 5, 2007).

At oral argument, Unum suggested that strict tracing
rules are not appropriate here because its claim against
Sivalingam is within the compass of the Supreme Court's opinion
in Sereboff v. Mid-Atl. Med. Servs. Inc., 547 U.S. 356, 364-65
(2006).  In Sereboff, the policy at issue included an "Acts of
Third Parties" provision.  Id. at 359.  If the plan fiduciary was
required to pay a beneficiary's medical expenses due to injuries

caused by a third party, this provision compelled the beneficiary to reimburse the fiduciary the amount of those expenses from any recovery obtained from the third party. Id. at 359-60. The Court noted that "in the days of the divided bench," a "contract to convey a specific object even before it is acquired will make the contractor a trustee as soon as he gets a title to the thing." Id. at 364-65 (quoting Barnes v. Alexander, 232 U.S. 117, 121 (1914)). The Court held that in traditional equity practice strict tracing was not required when an equitable lien arose on property by agreement such as in the Acts of Third Parties provision. Unum has not identified any similar policy provision affording it a right to recover overpayments of plan benefits.[20] Thus, Sereboff does not justify relaxing the tracing rules otherwise required under the Supreme Court's opinion in Knudson. See Knudson, 534 U.S. at 213-14.

In sum, Unum is not entitled to summary judgment on its counterclaim to impose an equitable lien or a constructive trust on Sivalingam's bank accounts or real property.[21]

VIII.

Sivalingam also seeks an award of disability benefits due under the policy since Unum terminated payments in May 2008

20. We note that Unum has included such provisions requiring the beneficiary to repay overpayments in other long term disability policies. See Fier, 2009 WL 3644187, at *12.

21. We express no opinion on whether Unum could recoup any overpayment to Sivalingam through an offset against any future payments of disability benefits that it otherwise is required to pay him under the policy.

and an order requiring Unum to resume making payments in the future.  While we have concluded that Unum improperly terminated benefits as of January 11, 2004, we have nothing before us to make a determination as to whether Sivalingam is entitled to benefits after May 2008.  For example, we do not know his indexed pre-disability earnings for these years or what his current earnings were.  Nor do we know whether Unum may be entitled to offset any overpayments that may have been made prior to May 2008 against any payments due but not yet paid.  See Northcutt v. Gen. Motors Hourly-Rate Emp. Pension Plan, 467 F.3d 1031, 1037–38 (7th Cir. 2006).  Thus, we must deny Sivalingam's motion for summary judgment to the extent it asks the court to reinstate his disability benefits and to award past-due benefits.

IX.

Unum has moved to strike Sivalingam's reply brief in support of his motion for summary judgment because it is over the length permitted by this court's practices and procedures.  We agree that Sivalingam's reply brief was unnecessarily long and advances arguments not presented in its opening brief, but we do not find it necessary to strike any portion of the brief.